**James E. OTEY, Plaintiff,**

v.

**The COMMON COUNCIL OF the CITY OF MILWAUKEE, a municipal legislative body, Board of Election Commissioners of the City of Milwaukee, a municipal statutory agency, and Ray Markey, City Clerk of the City of Milwaukee, Defendants.**

**No. 67–C–402.**

United States District Court
E. D. Wisconsin.
March 5, 1968.

Leonard S. Zubrensky, Herbert S. Bratt, and Richard Perry, Milwaukee, Wis., for plaintiff.

Harry G. Slater and Ewald L. Moerke, Jr. Asst. City Atty., Milwaukee, Wis., for defendants.

H. William Ihrig, Ted Warshafsky, Milwaukee, Wis., Edward C. Petri, Jr. and Wayne Bernhagen, Robert Dwyer, Milwaukee, Wis., amici curiae.

## OPINION

TEHAN, Chief Judge.

On November 28, 1967, the complaint in this class action was filed by James E. Otey, a citizen of the United States and resident of the City of Milwaukee, againt the Common Council of the City of Milwaukee, allegedly consisting of Milwaukee's Mayor and aldermen, the Board of Election Commissioners of the City of Milwaukee and the City Clerk of the City of Milwaukee.

The complaint alleges that the plaintiff, a Negro, has the right under the Fourteenth Amendment to the United States Constitution and § 1982, Title 42, U.S.C. to acquire, enjoy, inherit, purchase, lease, sell, hold, convey and dispose of property free from discriminatory action, and that the subject of discriminatory action with respect to that right regarding residential property, referred to as "open housing", has been a concern to elective officials and residents of the City. It summarizes the history of proposed open housing ordinances introduced in the Common Council from 1962 to the date of filing of the complaint, none of which, as of that date, had been passed, and action by a subcommittee of the Common Council's Committee on Judiciary-Legislation. It then alleges that on November 6, 1967, petitions were filed with the City Clerk pursuant to § 9.20, Wisconsin Statutes [1] requesting adoption by the Common Council or reference to

---

1. § 9.20, Wisconsin Statutes, entitled "Direct legislation," provides in relevant part:

"(1). A number of electors equal to at least 15% of the votes cast for governor at the last general election in their city may sign and file a petition with the city clerk requesting that an attached proposed ordinance or resolution, without alteration, either be adopted by the common council or referred to a vote of the electors. * * *

\* \* \* \* \*

(3) Within 15 days after the petition is filed, the city clerk shall determine by careful examination whether the petition is sufficient and whether the proposed ordinance or resolution is in proper form. He shall state his findings in a signed and dated certificate attached to the petition. * * * When the original or amended petition is found to be sufficient and the original or amended ordinance or resolution is in proper form, the city clerk shall so state on the attached certificate and forward it to the common council immediately.

(4) The common council shall, without alteration, either pass the ordinance or resolution within 30 days following the date of the clerk's final certificate, or submit it to the electors at the next election, * * *.

(5) Not more than 3 nor less than one week before the election, the city clerk shall cause the ordinance or resolution that is being submitted to a vote to be published once in a newspaper as are city ordinances.

\* \* \* \* \*

(7) If a majority vote in favor of adoption, the proposed ordinance or res-

a vote of the electorate of the following resolution:

"BE IT RESOLVED:

That the Common Council of the City of Milwaukee SHALL NOT enact any ordinance which in any manner restricts the right of owners of real estate to sell, lease or rent private property.",

that the Clerk thereafter certified that the petitions complied with the requirements of the statute, that by reason of that certification the Common Council then was required under the statute either to pass the resolution proposed in the petitions within thirty days or submit it to the electorate and that the Council's Committee on Judiciary-Legislation voted on November 20, 1967 to recommend to the Common Council that the proposed resolution be placed on the ballot at the Spring, 1968 election. State legislation with respect to open housing is also referred to. After alleging that the vast majority of Negro residents of Milwaukee live in segregated housing conditions, the plaintiff avers that the adoption of the proposed resolution by the Common Council or the electorate would deny him and others like him equal protection of the laws and deprive them of their rights, privileges and immunities as United States citizens, that the petitions were submitted and the resolution, if adopted, would be adopted under color of State law and that a declaration of the rights of the plaintiff and his class and the constitutionality and legality of the enactment of the now-pending resolution is necessary. The complaint seeks a judgment declaring the above-quoted resolution unconstitutional and restraining the defendants from acting upon it or submitting it to the electorate.

On November 29, 1967, the court signed an order directing the defendants to show cause on December 6, 1967 why a temporary injunction should not issue. On the return day, it appearing that the Common Council would not itself pass the resolution under § 9.20(4) and that immediate, and hurried, action was not necessary, the court entered an order pursuant to Rule 65(a) (2), Federal Rules of Civil Procedure, advancing trial of this action on the merits and consolidating said trial with the hearing of plaintiff's motion for a temporary injunction. It further ordered the filing of answers and scheduled a conference to set a trial date.

An answer was filed on December 18, 1967 by the Election Commissioners and City Clerk, represented by the City Attorney, taking no position with respect to the constitutionality of the referendum question or of its being on the ballot but alleging that they would comply with the duties imposed upon them by § 9.20, Wisconsin Statutes, unless otherwise directed by the court. A motion to dismiss was filed by the Mayor and Common Council, also represented by the City Attorney, on December 21, 1967, indicating that after the occurrences set forth in the complaint the Common Council, acting pursuant to § 9.20, had adopted a resolution placing the resolution contained in the petitions on the ballot and that the Mayor had signed the Common Council's resolution. The Common Council contended that its actions were mandatory and that under § 9.20 it had no further action to take which could be enjoined by this court. The Mayor contended that his action in signing the Common Council resolution was lawful and that under § 9.20 he, too, had no further action to take which could be enjoined. Both noted that the plaintiff herein has not challenged the legality of § 9.20, pursuant to which the Common Council acted in dealing with the

---

olution shall take effect upon publication under sub. (5). Publication shall be made within 10 days after the election.

(8) City ordinances or resolutions adopted under this section shall not be subject to the veto power of the mayor and shall not be repealed or amended within 2 years of adoption except by a vote of the electors. The common council may submit a proposition to repeal or amend the ordinance or resolution at any election."

petitions and as a result of which the Mayor acted in reviewing the Common Council action, and argued that no possible relief could be obtained against them and they should be dismissed as parties defendant. Because the court deemed it impossible to conclude as a matter of law that no state of facts provable under the complaint would warrant the granting of equitable relief against the movants the motion to dismiss was denied.

Neither of these movants thereafter filed any answer to the complaint, both indicating, through the City Attorney, that they would present no argument with respect to the constitutionality of the resolution and would continue to assert that they had no interest in this cause of action for the reasons set forth in their motion to dismiss. All defendants have indicated that they believe no case or controversy or justiciable controversy within the jurisdiction of the court exists, apparently because none chooses to take a position on the merits adverse to the plaintiff. We shall subsequently consider the question of whether there here exists a case or controversy.

On January 12, 1968, the court scheduled trial of this action for January 23, 1968, and the parties agreed to present at the trial such evidence as they felt necessary on the issue of whether a case or controversy exists.[2] That hearing has now been held, briefs have been filed by the parties and by persons who have been permitted to file briefs as amici curiae, and the court is prepared to render its decision.

The first question presented in this case is whether the resolution, if adopted after a vote of the electorate, would deny the plaintiff and his class—Negro residents of the City of Milwaukee—the equal protection of the laws guaranteed to them by the Fourteenth Amendment to the United States Constitution. Our task with respect to this question has been eased significantly by the fact that the United States Supreme Court, in its very recent decision in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed. 2d 129, considered a similar, but not identical, issue and set forth precedents and general principles to serve as our guideline.

*Reitman* recognizes the teaching that the Fourteenth Amendment does not prohibit private discrimination nor require a State to assume other than a neutral position with respect thereto. What it does proscribe is discrimination by the State (and, of course, by any political subdivision thereof) or significant State involvement in, State encouragement of, or State authorization of private discrimination.[3] *Reitman* further teaches that in examining the constitutionality of a law, the court should properly consider not simply the wording of the enactment, but its immediate objective, its ultimate impact and its historical context and conditions existing before its passage. In determining whether the law significantly involves the State in private discrimination the court must, under *Reitman,* sift the facts and weigh the circumstances as to its passage and potential impact.

At this point before considering the facts and circumstances, it must be observed that the pleadings reveal that this case is distinguishable from *Reitman* in three respects, which might be argued to be significant. First, the wording of the resolution differs from that of Article I, § 26 of the California Constitution. Second, the adoption in *Reitman* of Prop-

---

2. Under ordinary circumstances, the jurisdictional issue, although not formally raised by defendants, would have been considered first and separately, but in the interests of affording a speedy hearing at which evidence relevant on both this issue and the merits might be presented, it was decided that both matters would be presented simultaneously at the trial.

3. For a discussion of State action in relation to the equal protection clause, of State neutrality, and of the *Reitman* case, see Charles L. Black, Jr., Foreword: "State Action," Equal Protection, and California's Proposition 14, 81 Harv.L. Rev. 69 (1967).

osition 14 nullified existing open housing laws in California. Third, *Reitman* arose after the adoption of Proposition 14 and no successful attempt was there made to enjoin submission of Proposition 14 to the electorate.

California's Proposition 14, which became Article I, § 26 of its Constitution, prohibited the State from interfering with the right of any person *to decline to sell, lease or rent* his real property to whomever he, in his absolute discretion, chooses. Milwaukee's resolution takes another approach, forbidding the Common Council to enact any ordinance restricting rights of real estate owners *to sell, lease or rent* their property. Plainly implicit in this proscription, when read in the light of the background which we shall hereinafter discuss, is a mandate to the Common Council to refrain completely from acting in the area of open housing by passing any ordinance to prohibit private discrimination. As stated by a council member, Alderman Dwyer, who submitted a brief arguing that the adoption of the resolution would be constitutional:

> "In the context of this action, the proposed resolution if adopted, forbids the Common Council from eliminating, within the next two years (See § 9.20 (8), Wis.Stat. quoted previously) the exemptions in the present open housing law."[4] (P. 3)

> "It (the resolution) expresses, in a negative form, a decision to continue not to forbid. Private discrimination is now legal. The resolution would publicly call attention to this fact, and make known to all that this state of affairs is to continue for a period of at least two years." (Pp. 7–8)

It is our opinion that this difference in wording between Proposition 14 and the Milwaukee resolution is of no import, the purpose and effect of the two being the same.[5]

In our opinion neither is it a meaningful distinction in examining constitutionality that the adoption in *Reitman* of Article I, § 26 of the California Constitution nullified existing State open housing laws while the Milwaukee resolution looks to the future only and is not calculated to nullify any existing local open housing ordinance, there being none in existence when the petitions under the direct legislation statute were submitted.[6] We do not read *Reitman* as being based on the fact of a repeal of existing open housing legislation, this being at most one factor in the circumstances leading the Supreme Court to its decision.

We shall implicitly dispose of the third distinction between this case and *Reitman*, relative to the timing of the challenge to constitutionality, in connection with our discussion of relief.

At the trial the following facts were established relative to the question of whether the proposed resolution, if adopted, would be violative of the Fourteenth Amendment:

The City of Milwaukee, like many other American cities, has an "inner core" or "inner city"—an older area of the municipality to which the vast majority of its Negro residents has been relegated for fulfillment of their housing needs. Living conditions in this inner city are, to a large extent, substandard and overcrowded, and compare unfavorably with other areas of the city, even those nearby. In the past few years many Whites who resided in the inner city have departed,

---

4. The "present open housing law" referred to is Ordinance No. 742—enacted after commencement of this action—duplicating in all material respects § 101.60 Wis. Stat., an open housing law on the State level with many broad exceptions.

5. The fact that California's constitutional provision operated throughout the State for an unlimited period while the Milwaukee resolution would operate only lo-cally and be subject to amendment or repeal by the Council after two years is a matter of degree and not principle, immaterial in considering the merits.

6. As stated in Footnote 4, an open housing ordinance duplicating State law has since been passed but this ordinance need not be considered here since it did not and does not affect the status quo in any way material to this case.

but only an insignificant number of Negroes have moved out of that area [7]. This is true despite the fact that the purchasing ability and earning power of many Negroes would permit their moving to better housing in other areas of the City.

The record, including not only the testimony of witnesses but also evidence of the housing patterns existing in the City, reveals that economics is not a determining factor when Negroes attempt to relocate their homes. Race is a factor of almost transcendent significance and Negro home buyers or lessees wishing to leave the inner city are faced with barriers of discrimination which few have been able to overcome. When housing outside the inner city is sought, attributes otherwise crucial in choosing buyers and tenants, such as ability to pay, educational background, demeanor, reliability and stability, are not even investigated by sellers and landlords after the color of the applicant is discovered. Although other excuses may be and are given, it is clear that racial discrimination on the part of sellers and landlords or those whose opinions influence their actions is responsible for the Negroes' inability, except in rare instances, to leave the inner city.[8]

According to Dr. Philip M. Hauser, Professor of Sociology at the University of Chicago, whose testimony was presented at the trial, social problems of the Negroes—delinquency, crime, lower achievement in school, apathy, family disorganization, poverty, etc.—are perpetuated by the segregated community in which they live and will not change while the Negroes remain concentrated in segregated areas.

For this reason, and because of the problems they encounter when they want to leave the ghetto, open housing legislation has become a most important symbol to the Negroes in the nation—a symbol of acceptance, of advancement and ability to advance, of a breakthrough in a cycle of second class citizenship, and, according to Dr. Hauser "probably the most important symbol on the horizon with respect to the next steps in the advancement of the Negro towards equality of opportunity and full citizenship in these United States." (P. 223, Transcript) In the City of Milwaukee in recent times this symbol of open housing has acquired a very special significance.

The first attempt to obtain an open housing ordinance for the City of Milwaukee was made on March 20, 1962 when Vel R. Phillips, only Negro member of the Common Council, introduced an ordinance prohibiting discrimination in the sale or lease of any housing because of race, color, religion, ancestry or national origin. Action thereon was indefinitely postponed by the Council by an 18 to 1 vote. After that defeat, open housing advocates directed their efforts toward passage of a State open housing law. A State law, referred to in Foot-

7. From 1960 through 1966 the Negro population of the City increased from approximately 62,500 to approximately 88,600 while the total population increased from approximately 741,300 to approximately 788,000. In 1960, 1030 Negroes in 247 households lived outside the inner city and six years later this number had increased to only 1760 Negroes in 422 households. In that same period, over 19,000 Whites left the inner city.

8. Many other minority groups have also lived in slums upon arrival in this country and, with the passage of time, were able to "work their way up" and out. Their situation, however, did not parallel the plight of the Negroes in one vital, unchangeable respect. In time, those groups, be they Irish, Italian, Polish, Slavic, lost their "visibility", that is, the accents, dress and physical characteristics marking individuals as members of groups which were the objects of prejudice and hostility, disappeared. The Irish, for example, lost their brogues, and the Jews shaved their beards, and the hated stereotype could not be applied to the individual, who then became free to participate in the housing and employment market without discrimination. The Negroes' visibility remains, however, and locks them to the stereotype, preventing their escape from prejudice and hostility and inhibiting their entry into an open market to a degree not experienced by other groups.

note 4, was passed in December, 1965, prohibiting discrimination in the sale or lease of housing, but it contained so many exceptions that only about 25% to 33% of the City's housing was affected.

In May of 1966, Mrs. Phillips introduced her second broad open housing ordinance in the Common Council, and again the Council voted, on July 12, 1966, to indefinitely postpone action thereon, the vote being, once again, 18 to 1. Similar ordinances introduced by Mrs. Phillips received similar treatment on December 13, 1966 and June 13, 1967.

On Sunday evening, July 30, 1967, and extending into early Monday morning, July 31, 1967, a riot broke out in Milwaukee, during which gangs of Negroes, mainly youths, descended upon the vicinity of upper Third Street, in the inner city, breaking windows, destroying property and throwing rocks and bottles at passing cars. Due to quick police response and the providential downpour of rain, the major part of the disturbance was quelled within five hours but the City was under extreme tensions for weeks. A state of emergency lasting until August 9th, was declared by the Mayor early Monday morning and a 24-hour curfew imposed on the entire city. The National Guard was called in, 4500 troops being here at one stage, and remained until August 7th. During the riot and the tense period that followed, three persons were killed and approximately 100 injured. A number of fires occurred (129 fires and 71 false alarms) and police were harassed by snipers. About 1740 arrests were made. While an accurate total of the cost of the riot was not presented to the court, the following estimates were made available:

> Unrecoverable loss was $570,000; fire damage was $116,265; damage of $2,490 was caused to Fire Department equipment.

No estimate was made of police and fire department overtime costs, costs for National Guard personnel, nor of the cost to business and individuals due to the curfew but we would estimate these costs to be considerable.

In August, 1967, proponents of open housing legislation for the City of Milwaukee, both Negro and White, began demonstrations to attain this end. On August 28th and 29th, the demonstrations consisted of marches to Milwaukee's south side where much but by no means all of the vehement opposition to open housing is to be found. Since that time and up to the time of trial, a total of 145 nightly marches occurred in which the number of marchers ranged from about 40 to 2300.

During the two August marches to the south side, much hostility toward the demonstrators was displayed. Police protection for the marchers, including the use of tear gas, was necessary and 38 arrests, mostly of White hecklers, were made. Disagreement with the marchers and their cause was expressed not only by jeering, but by throwing rocks and bottles. In the wake of these marches the Milwaukee Citizens Civic Voice (MCCV), a group which we shall discuss later, was formed.

Mrs. Phillips introduced a fifth open housing ordinance before the Common Council on September 19, 1967, which, like its predecessors, prohibited discrimination in the area of housing on the basis of race, color, religion, ancestry or national origin but clarified the fact that inquiries as to family, marital, financial and business status were permissible. On the same day, the Mayor submitted a proposed resolution regarding open housing to the Council similar in coverage to Mrs. Phillips, but providing that it should take effect only after 51% of Milwaukee's surrounding suburbs pass and publish it.[9] Both Mrs. Phillips'

9. By Chapter 218, Laws of 1967, published December 9, 1967, the State of Wisconsin has provided that no local open housing ordinance may be contingent on enactment of a similar ordinance by other cities, villages, towns or counties. The action of the State in this respect was undoubtedly provoked by Mayor Maier's attempt to make City legislation dependent on positive action by surrounding suburbs.

and the Mayor's proposals are being held by the Council's Committee on Judiciary-Legislation for further study.

In October of 1967, in the Common Council's first concrete action with respect to the flammable open housing issue, its Committee on Judiciary-Legislation established a subcommittee on open housing consisting of five aldermen and representatives of six organizations. This subcommittee met in closed session for about 20 consecutive hours on October 21st and October 22nd and filed a report with the Committee on October 25, 1967. It recommended enactment of a fair housing ordinance and, since unanimous agreement had not been reached, set forth three alternative recommendations. The first was for an open housing ordinance with no exclusions; the second was for a local ordinance copying in substantial respect the State law; the third was for an ordinance covering all sales and excluding only rentals of owner-occupied duplexes and rooms in owner-occupied dwellings with four roomers or less, and rental of housing accommodations by religious and denominational institutions.[10]

On November 6, 1967, the City Clerk received the petitions calling for the adoption by the Council or submission to the electorate of the resolution involved in this suit. The Clerk certified the petitions to the Council as properly filed under § 9.20, Wisconsin Statutes. On November 16, 1967, the City Attorney advised certain Common Council members that serious questions existed as to the constitutionality of the resolution and that under § 9.20 the Council had to pass it without alteration or submit it to the electorate. On November 20, 1967, the Committee on Judiciary-Legislation recommended the latter course, which the Common Council thereafter took. The resolution will now be submitted to the electorate at the April, 1968 election unless the plaintiff's prayer for relief is granted.

Before ruling on the constitutionality of the resolution, it is necessary to give a brief description of the MCCV, the group which circulated the petitions which gave rise to this case, since, according to *Reitman*, the purpose and intent of the resolution, its "immediate objective," is a relevant factor in determining its constitutionality. Its purpose and intent, in our opinion, can best be ascertained from the MCCV, its sponsor and originator.

As we stated previously, the MCCV, a group of 319 people, was formed in reaction to the open housing marches to Milwaukee's south side and after the riot. From 50 to 200 of its members circulated the petitions here involved commencing on about October 1, 1967.

The aims of the MCCV were described on the witness stand by its Executive Secretary, Edward C. Petri, Jr., who has filed a brief amicus curiae in this case. Its stated purpose is to obtain open housing legislation on a national or State [11] level. Despite the positive nature of its avowed purpose, it has taken only one course of action, a negative one, in furtherance thereof, that is, to oppose open housing legislation on the local level. For this purpose and this purpose alone, it circulated and submitted the petitions involved herein, and the resolution contained in those petitions is admittedly intended to prevent and prohibit the enactment of an open housing ordinance in the City. According to Mr. Petri, the purpose of the petitions was to obtain a referendum in the City by which the people could express their choice (prohibiting open housing legislation) and thereby obtain education and force broader legislation (passage of open housing legislation

10. According to Mrs. Phillips this third recommendation was a compromise measure agreed to, at one point in the subcommittee meeting, by all but one of the members. Approximately five or six hours of the meeting were spent in trying unsuccessfully to persuade this member so as to arrive at a unanimous decision.

11. Mr. Petri testified however that the group opposes the present State open housing law because national legislation is preferable.

on a State or national level).[12] The group has also conducted marches protesting "wrong actions" by city officials,[13] and has marched to support aldermen who opposed local open housing legislation.

A study of the testimony of Mr. Petri reveals quite clearly that the MCCV wants no open housing legislation at all, that its protestations of wanting such legislation on a broader level are an obvious sham, and that the group was organized to move to block the possibility of open housing wherever it reared its head. It is opposed to local open housing legislation now because that is the type of open housing legislation being considered. When broader legislation is considered which will encompass local housing, we are certain the MCCV will be equally opposed, just as it is opposed to the weak State law now in effect. The court rejects as incredible Petri's declaration that MCCV members, who have done nothing thus far but oppose open housing, were inspired by the August marches to the south side and their violent reactions to band together to try to secure open housing on any level.

██ Viewed in the light of *Reitman*, the foregoing facts convince us that the resolution, if enacted into law, would be violative of the rights of the plaintiff and the class he here represents to the equal protection of the laws guaranteed by the Fourteenth Amendment. Without question the record reveals that the resolution is intended to and, if passed, will, secure to those desirous of discriminating in the area of housing their "right" so to do for a period of two years at least. The only real constitutional issue is whether the resolution, if passed, would be merely a permissible expression of the local government's position of neutrality with respect to private discrimination or would constitute government involvement in, authorization of or encouragement of private discrimination.

In this regard, it must first be noted that the resolution, by its terms, does not merely express a neutral posture. Oblique though its wording may be, it bars absolutely any other position, and renders attempts to secure political action in this crucial housing area nugatory for a period of at least two years.[14] With the open housing controversy in Milwaukee at its peak, it not only would give statutory sanction to those who wish to discriminate without interference, but would prevent any change. Under these circumstances we hold that the resolution, if enacted, would significantly involve the City in private discrimination and unquestionably encourage such discrimination, and it therefore constitutes State action proscribed by the Fourteenth Amendment.

Counsel for the defendants have argued earnestly that the court is without jurisdiction to consider whether the proposed resolution is constitutional since no controversy as to its constitutionality exists. It therefore follows, they contend, that no declaratory or injunctive relief can be granted.

It is certainly true that the defendants, who behaved more like observers than participants at the trial, avoided taking any position with respect to the merits of the plaintiff's action. We cannot agree, however, that this inaction bespoke lack of a controversy, depriving this court of jurisdiction, or that the Common Council's position in this matter is strictly

---

12. Mr. Petri did not explain how defeat of local open housing legislation could encourage its enactment on a larger scale.

13. The only city officials mentioned whose conduct was deemed wrongful were aldermen who were suspect of being soft in their opposition to open housing legislation.

14. As a practical matter we also recognize that the two year proscription against repeal or amendment in § 9.20(8) may well be an unrealistically short estimate of the effective period of the enacted resolution. Affirmative action would be required to remove it from the books and the Common Council thus far has demonstrated an extreme reluctance to take action in this area which reluctance would obviously not be dispelled by voter adoption of the resolution.

neutral, so that no interest adverse to the plaintiff was joined.[15]

Granted, there is no proof in the record that the Common Council or any of its members were responsible for circulation of the petitions which now concern us. However, the Council, after being advised of the doubtful constitutionality of the resolution, and being well aware of the highly controversial dispute in the City concerning open housing, took affirmative action placing the proposed resolution on the ballot.[16] Further, the record contains uncontroverted testimony that if the resolution is enacted into law, the Common Council will abide by it by refusing to consider any open housing legislation while it remains on the books. Council members would be happy to consider themselves bound by this expression of the will of the people, constitutional or not, and refuse to act.

■ We see no need to consider at length authorities cited in support of the position that we lack here a controversy between adverse parties. A controversy undoubtedly exists in this City between the plaintiff and his class and those who seek to deprive them of their right to equal protection of laws. The Common Council is involved in this deprivation, and it is clear from the record it will continue to be involved adversely, should the resolution pass, by refusing to consider action in contravention of its terms. The City Clerk and Election Commission are prepared to act under § 9.20 unless this court directs otherwise. If, under these circumstances, we have no justiciable controversy, we have arrived at that desolate state described by Charles L. Black, Jr. (see footnote 3) where "community organization of racial discrimination can be so featly managed as to force the Court admiringly to confess that this time it cannot tell where the plea is hidden."

### RELIEF

■■ The proposed resolution having been found to be palpably unconstitutional [17] if enacted, the question of the pro-

15. Counsel for defendants were unable, when asked by the court, to suggest who a possible adverse party, as they understood the term, might be, and we must assume from their argument that they believe that at this time the plaintiff has no one against whom he can assert a cause of action for clear violation of his constitutional rights. The wording of the resolution is such that, even after its enactment, the situation will be the same. We can conceive of no concrete fact situation that can arise thereunder, as one did in *Reitman*, since the resolution by its terms simply commands Council inaction. If enacted and respected by the Council, the resolution could effectively remain on the books indefinitely and the plaintiff and his class, if the defendants' position were correct, could have no way of challenging its constitutionality in any court.

16. Counsel for the defendants argue that § 9.20 gave the Common Council but two alternatives—to pass the ordinance itself or submit it to the electorate. Wisconsin law with respect to direct legislation is not that unyielding. Local governing bodies have in the past ignored petitions under the direct legislation statute when the matters contained therein were deemed illegal or improper without criticism by the Court. (See for example, Heider v. Common Council of City of Wauwatosa, Wis., 155 N.W.2d 17 (1967); Henderson v. Hoesley, 225 Wis. 596, 275 N.W. 443 (1937) and Flottum v. City of Cumberland, 234 Wis. 654, 291 N.W. 777 (1940). See also Thompson v. Village of Whitefish Bay, 257 Wis. 151, 42 N.W.2d 462 (1950) wherein the Wisconsin Supreme Court considered the legality of a referendum question in a mandamus proceeding prior to submission to the voters rather than denominate the village board's duties under § 10.43, now § 9.20, as ministerial). They could surely refuse to act on petitions submitting proposals for unconstitutional action. While they might thus subject themselves to a mandamus proceeding, the issue of constitutionality could then be cleanly determined in a suit in which promoters of the unconstitutional legislation would be forced to take affirmative action.

17. Aside from the reasoning stated above, the phraseology of the proposed ordinance raises another very serious issue as to whether such a statute lies within the province of a legislative body to enact. It appears axiomatic that a legislature cannot by statute irrevocably withdraw a

priety of relief sought remains in dispute. The plaintiff asks for a permanent injunction against the submission of the referendum by the defendants to the electorate. The requested mode of relief raises two issues, namely, the propriety of an injunction against the holding of a referendum, as a matter of law, and the merit of the plaintiff's claim to injunctive relief, on the facts in this case.

*Propriety of Relief as a Matter of Law*

The first issue, involving the propriety of injunctive relief, as a matter of law, may be posed as a single question, namely: Would this court unjustifiably interfere with the legislative process, were it to grant an injunction so as to proscribe the holding of a referendum prior to enactment into law of the proposed ordinance?

Beneath traditional restraints on judicial interference with the legislative process lies the anticipated danger of disturbing the opportunity of legislative bodies to amend or alter proposals pending before them. Courts therefore may feel constrained from interfering with an initiative. But in the instant case, because of Wisconsin's method of direct legislation, the Milwaukee Common Council can no longer alter or amend the proposed ordinance. The defendants themselves have argued that their only role now is a strictly ministerial one of *pro forma* fulfilling the mandate of State Law. The appropriate legislative body has acted. Thus a stage of the direct legislation has been reached which operationally resembles a referendum, rather than an initiative. Hence, any fear the defendants may have of oppressive or unwarranted judicial interference in the legislative process is misplaced.

Also implicit in the defense presented here of anticipated judicial interference

is the fallacious assumption that the "will of the electorate" should invariably prevail, as well as a specious analogy of the present case to certain collective bargaining disputes, customarily resolved outside the courtroom. Such line of argument suffers from a confusion of *vox populi* with *vox Dei*, which rationalizes a total immunization from criticism of what perhaps may be the positive morality of a community, without regard to minority rights.

"It seems fatally easy to believe that loyalty to democratic principles entails acceptance of what may be termed moral populism: the view that the majority have a moral right to dictate how all should live. This is a misunderstanding of democracy which still menaces individual liberty * * *."

H.L.A. Hart, Law, Liberty, and Morality 79 (Vintage paperbk.1966)

As Justice Douglas stated in concurring with the decision in Reitman v. Mulkey (387 U.S. p. 387, 87 S.Ct. p. 1637):

"And to those who say that Proposition 14 represents the will of the people of California, one can only reply:

'Wherever the real power in a Government lies, there is the danger of oppression. In our Governments the real power lies in the majority of the Community, and the invasion of private rights is *chiefly* to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the Constituents. This is a truth of great importance, but not yet sufficiently attended to * * *.' 5 Writings of James Madison 272 (Hunt ed. 1904)."

---

topic from the scope of future legislation; that is, a legislature cannot irrevocably bind its successors. See e. g., H.L.A. Hart, The Concept of Law 146–147 (Oxford University Press 1961). Since under a referendum, city electors exercise only such legislative power or authority as is

conferred upon the common council, it follows likewise that the Milwaukee electorate cannot irrevocably bind successor members of the common council. (Feavel v. City of Appleton, 234 Wis. 483, 291 N. W. 830 (1940).

 Moreover, the principle of judicial non-interference is one of prudence, not of power. Thus, even if we assume the presence of judicial interference here, we must recognize that the principle of non-interference yields to an exception "where the constitutional rights of a citizen and taxpayers are sought to be invaded by an attempt to make an unconstitutional or inapplicable law operative through the means of popular election." Tolbert v. Long, 134 Ga. 292, 67 S.E. 826 (1910); see also Schultz v. City of Philadelphia, 385 Pa. 79, 122 A.2d 279 (1956); State ex rel. Steen v. Murray, 144 Mont. 61, 394 P.2d 761 (1964).

 Viewing the issue from a slightly different perspective, we arrive at the same conclusion. It is clear that a United States District Court has the power to enjoin the holding of an election. Hamer v. Campbell, 358 F.2d 215 (5th Cir. 1966); see also State of Alabama v. United States, 304 F.2d 583 (5th Cir. 1962). Those two cases involved unconstitutional irregularities in state processes of registration and election. To be sure, the procedural nature of these irregularities arguably might distinguish them from the instant case, in which the constitutional blemish is substantive. Nevertheless, there is authority which supports the issuance of an injunction to restrain the holding of a state election regardless of the precedural-substantive distinction, where authority for calling it is missing, or where the holding of it would result in a waste of public funds. Baum v. City of St. Louis, 343 Mo. 738, 123 S.W.2d 48 (1938). Closely in point of the instant case, we are persuaded by the comment that

"[i]t seems to be the majority view that the submission to the voters of an amendment to a state Constitution may be enjoined when the proposed amendment, if adopted, would clearly and palpably violate a provision of the paramount Federal Constitution; and the submission of a statute to the voters may be enjoined where the statute, if adopted, would clearly contravene provisions of either the Federal or state Constitution." 94 A. L.R. 812 (1935) and the following cases cited therein: Gray v. Winthrop, 115 Fla. 721, 156 So. 270 (1934); Mathews v. Turner, 212 Iowa 424, 236 N.W. 412 (1931). See also the dissent in Davis v. Synhorst, 217 F.Supp. 492, at 506–507 (S.D.Iowa 1963); and Caine v. Robbins, 61 Nev. 416, 131 P.2d 516 (1942)

 To be sure, the cases cited involved elections for public office and referenda involving proposals for State constitutional amendments, whereas here we are concerned with a local referendum. But this distinction is immaterial. First, virtually since its inception, the direct referendum in Wisconsin has been deemed a conventional form of election. As the Wisconsin Supreme Court stated in Vulcan Last Co. v. State, 194 Wis. 636, 217 N.W. 412 (1928):

"The referendum upon the question of issuing bonds * * * was 'an election.' 'An "election," within the meaning of the statutes of this state, includes a referendum vote to decide a question of policy such as the issuance of bonds, * * * just as well as it includes an ordinary election to choose between candidates for public office. The very definition given of the word in Brown v. Phillips, 71 Wis. 239, 36 N.W. 242, is "the act of choosing; choice." Whether it is a choice between alternative policies or a choice between persons, it is equally an election. If further argument were needed on this proposition it would be readily found in the fact that such referendum votes are always termed "elections" by our statutes.' Hall v. Madison, 128 Wis. 132, 137, 138, 107 N.W. 31." (639–640, 217 N.W. 414)

Second, we have already intimated that the important factor as to this court's review of the object of a vote is neither the particular mode in which it is presented to the electorate, nor the geographical reach of the interpreting and

implementing authority, but rather the extent of state action, which we earlier deemed to be sufficient here to raise a Fourteenth Amendment question. It is therefore immaterial to the question of propriety of relief whether a matter of policy is put before the voters as statewide or merely as local direct legislation. Nor is it material whether the object of the vote is in the form of a proposed constitutional amendment or, as in the instant case, a proposed ordinance. It should be noted that, on grounds of unconstitutionality, one federal court recently enjoined a proposed referendum in Baltimore, whose purpose was to reapportion that city's council, Ellis v. Mayor and City Council of Baltimore, 234 F. Supp. 945 (D.Md.1964) aff'd and rem'd, 352 F.2d 123 (4th Cir. 1965).

*Merit of Plaintiff's Claim on the Facts To Injunctive Relief.*

The physical danger to a community of racial tension and rioting is all but universally recognized. A number of witnesses convincingly testified that the mere holding of the referendum, without regard to any result thereof, would encourage further racial unrest in Milwaukee and a "longer, hotter summer of 1968." We shall return to this point later in the opinion.

In addition to prospective physical danger, the community faces as well the more indirect harm of an unwholesome public image, both nationally and internationally. Thus the community interest is unquestionably affected both directly and indirectly by the mere scheduling of the referendum.

 It is of course undisputed that, in order to obtain injunctive relief, the plaintiff must demonstrate that otherwise he, personally, and others in the same position, would suffer irreparable injury. The irreparable injury which the plaintiff complains of here is "discrimination in the past" and "continued discrimination" (Complaint, p. 10, para. 27, supported by Brief in Support of Plaintiff's Request for a Temporary Injunction, pp. 4, 7). It is important to grasp that, although the plaintiff did testify that he had personally experienced racial discrimination in his quest for more suitable housing, nevertheless he apparently does not limit his construction of "discrimination" to a particular act or event, but rather to an allegedly pervasive and persistent climate of community behavior, which the plaintiff sought to tap at trial not by the representation of injury to himself alone, but rather by the introduction of testimony tending to show a variety of discriminatory acts experienced by numerous members of his class. Plaintiff here is asserting an "impending and threatened" harm of a continuing nature. Thus the plaintiff's own circumstances of present housing are immaterial, insofar as he remains a member of this class, members of which are defined simply as Milwaukee Negroes. It is contended that merely as a member of this class characterized solely by skin color, the plaintiff was and, in the absence of injunctive relief, may in the future be, frustrated in attempts to secure more suitable housing in the city and thereby suffer the irreparable injury caused by a noxious social climate, which, it is contended, the proposed ordinance would encourage.

Plaintiff argues that irreparable injury will continue not only if the anti-open housing ordinance is approved by the electorate, but also if the referendum merely is scheduled insofar as it would probably involve a pre-election campaign in the community which, it is stated, would generate sufficient community disharmony as to further and unnecessarily jeopardize the plaintiff's position. Let us examine these interrelated arguments.

The plaintiff has presented compelling testimony showing that the mere retention of the possibility that more comprehensive open housing legislation may be enacted on behalf of the City of Milwaukee's Negro community serves several major purposes. Not only does it preserve the salutary hope of greater civil equality, but also, symbolically, it serves to instill a feeling among the Negro mi-

nority of increased acceptance by the white majority, as well as to forge closer rapport among different ethnic elements within the community and to revive a vital, but now flagging, sense of legitimacy in our political and socio-economic system on the part of disadvantaged residents of the inner core of Milwaukee.

As noted earlier, one of this country's most distinguished scholars of sociology, Dr. Philip M. Hauser, referring to the "revolution of rising expectations" which, he stated, has not by-passed the United States, testified as to the *symbolic* instrumentality of prospective open housing in kindling a sense of freedom of choice, acceptance, incentive, and motivation among disadvantaged and socially shunned citizens. To tarnish the symbol of future open housing, he continued, would be to underscore many Negroes' unfortunate self-hatred and sense of self-degradation; convert Negro alienation into strident hostility; convince Milwaukee Negroes of the bigoted nature of the predominantly white community; exacerbate existing racial tensions; intensify the feeling of Negroes that they are "locked in" the inner core indefinitely; and rigidify the polarization and *de facto* apartheid that presently characterizes the community. To enjoin the holding of the referendum on the other hand, he suggested, would be to avoid this harm by preserving the vision of the open-door out of the misery of the ghetto.

In regard to the pre-referendum period, Dr. Hauser testified as to the detrimental effect of unnecessary political debate, in and of itself, on the psyche of disadvantaged minority group members. Moreover, in context of probable harm to the community, Mr. Ben Barkin, an eminent local public relations man active in community affairs, testified that the prospect of a vote on the referendum question would further galvanize public opinion and elicit heated polemicizing, which in turn would be augmented by fund raising, billboard advertising, and all the other trappings of a full-fledged election campaign. The issue itself is so volatile as to be explosive if sparked by

campaign bally-hoo. To schedule the referendum, Dr. Hauser concluded, would thus be the "equivalent of throwing a lighted fuse into a keg of gunpowder." Dr. Hauser's testimony as to the explosiveness of the present climate was corroborated by Mr. Barkin and Dr. O'Reilly, Professor of Social Work, University of Wisconsin. The latter testified that Milwaukee's 1967 "riot" was but a "pallid imitation" of one; he concluded that if the referendum is held, Milwaukee could reasonably expect a general riot of the magnitude of previous ones in such communities as Detroit and Watts.

On the central issue of injunctive relief, it was therefore the uniform judgment of Dr. Hauser, Dr. O'Reilly, Mrs. Phillips and Mr. Barkin that the mere holding of a referendum probably would be dangerous, disruptive and destructive to the community. Moreover, to conduct the referendum would be to slap the cheek of an already unfairly deprived minority group. As to the allegedly educative value of the referendum campaign, as a matter of civic training, the testimony is convincing that the potential dangers would far outweigh any possible benefits performed by this mode of "education."

It has been contended furthermore that the actual passage of the ordinance by referendum vote would constitute a slap on the other cheek of the plaintiff and others in his class. Testimony was introduced which demonstrates that only about 25%–33% of the City of Milwaukee is covered by present State and City open housing legislation. Drawing from her years of exprience with her Common Council colleagues and her attempts to secure open housing legislation, Alderman Phillips stated her conviction that the Common Council would probably abide by the ordinance as the "will of the people," were it enacted by referendum vote. Thus, it is reasonable to anticipate that more comprehensive local open housing legislation would be foreclosed for at least two years, thereby fostering segregated housing conditions and not only tarnishing but, indeed, obliterating

the symbol of future open housing, by placing the matter beyond the political reach of those who would be immediately affected by it.

The *Tolbert* court, supra, drew additional support for its granting of injunctive relief from the anticipation that no adequate relief at law would otherwise be available after the enactment of controverted legislation. For a precis of similar necessity for judicial relief in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, see Archibald Cox, The Role of the Supreme Court in American Society, 50 Marq.L.Rev. 575, 592 (1967). Likewise, such a necessity exists here too, since because of the restrictive nature of the ordinance's language, it is doubtful that any adequate judicial or non-judicial relief would be forthcoming or even available should the ordinance be passed by the electorate. Meanwhile the plaintiff and others in the same position would suffer a continuing affront, that is, an "impending and threatened" harm related to the indignity and handicap of private acts of discrimination in the sale, rental, or lease of housing which occur after adoption of the proposed ordinance—even if sometime thereafter the ordinance is superseded by a declaration of its invalidity.

Persuasive evidence was presented which tended to show that housing in the inner core is to a great extent sub-standard, overcrowded and usually impossible to rehabilitate; that the residents of this area are dissatisfied and indeed preoccupied with frustrations related to inadequate housing, which is perceived by them as the number-one problem of daily life; that a high percentage of disadvantaged residents in the inner core would prefer to live elsewhere; that many would have the requisite purchasing ability to move elsewhere; that they are unable to do so because of discriminatory barriers erected by the white community; and that the Negro does not have the same freedom of choice that prior disadvantaged minority groups had in American history. Such discrimination persists notwithstanding that testimony tended to show that an influx of Negroes into a new neighborhood does not depress property values therein and, on the basis of "windshield surveys" by the Federal Housing Authority, that Negroes do well in maintaining the quality of their property. In view of these additional circumstances, injunctive relief is appropriate here.

Only the timeliness of the assertion of present and future irreparable injury and of the injunctive remedy remains at issue. The defendants raise the objection that the instant action is premature, that is, that judicial action should properly be abated at least until after the electorate has *pro forma* expressed itself. But in the total absence of any valid reasons against judicial activity in an equitable proceeding such as here, this objection is answered in our judgment by the language of the *Tolbert* court, supra, 67 S.E. at 827:

> "Certainly the remedy to enjoin the holding of the election would be more direct, and better calculated to avoid complications, than to remain passive until the law has been declared before beginning a proceeding to test its constitutionality."

The resolution which is presented to us in this case would be patently unconstitutional if enacted into law. No good reason has been shown for its submission to the electorate. On the other hand, considerable evidence has been presented which convinces the court that the holding of the referendum would do great irreparable injury not only to the plaintiff and his class but to the City as a whole. Under these circumstances submission of the resolution to the electorate must be enjoined.

This Opinion shall stand as and for Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Counsel for the plaintiff shall prepare an order for judgment in conformity herewith and submit it to the court and opposing counsel by March 6, 1968 at 11:00 o'clock

A.M. and a meeting with respect to the form of judgment will be held in Room 382 Federal Building, on March 6, 1968 at 2:00 o'clock P.M.