Augustine L. RANJEL, Ascension De Leon, Jr., Virginia Arriaga Williams, Macedonia Ayala, Betty Basey, Ira Q. Miller, Antonio M. Lira, Geraldine Hicks, and Ruby Mack, Plaintiffs,

v.

CITY OF LANSING, and Max E. Murningham, Mayor of Lansing, Defendants.

Civ. A. No. 5900.

United States District Court
W. D. Michigan, S. D.

Jan. 8, 1969.

Goodman, Eden, Robb, Millender, Goodman & Bedrosian, Detroit, Mich., Paul A. Rosen, Detroit, Mich., of counsel, Michael Davidson and Jack Greenberg, New York City, for plaintiffs.

Michael F. Cavanagh, City Atty., Lansing, Mich., for defendants.

## OPINION

FOX, District Judge.

This case arises under facts which have been stipulated by the parties. These stipulated facts are hereby incorporated, in their entirety, into this opinion. The court finds the following facts to be especially pertinent and persuasive.[1]

This action is brought to redress a denial of rights secured by the supremacy clause and the thirteenth and fourteenth amendments to the United States Constitution; the Civil Rights Act of 1866, 42 U.S.C. §§ 1982–83; The Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq.; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. (July 1968 Supp.); Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301 et seq.; and Regulations of the United States Department of Housing and Urban Development, particularly Title 24 C.F.R. §§ 1.4(b), 2(2), and § 205.1(g) of the Department's Low Rent Housing Manual. It is also an action for declaratory judgment under 28 U.S.C. § 2201.

Jurisdiction is proper in this court pursuant to Title 28 U.S.C. Sections 1343(3) and (4), and 1331(a). This is a class action brought pursuant to sections (a) and (b) (2) to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs are fair and proper representatives of the class which they represent, the Black and Mexican-Americans of low income status in the Lansing area.

It is first important to note the conditions under which these groups live in the Lansing area.[2] Although only slightly more than 10% of the Lansing residents are Black and Mexican-American, approximately 65% of these two groups are concentrated in a ghetto containing only 11% of Lansing's total population. One large section of this area is 91% Black; 75% of the housing is substandard or dilapidated; one-third of the housing is overcrowded; infant mortality rates are 50% greater in the ghetto; and the incidence of tuberculosis, heart disease, venereal disease, chronic arthritis and rheumatism, poor vision and hearing, poor dental care, malnutrition, mental illness, and chronic alcoholism are also higher than elsewhere in the city—yet the level of municipal services necessary to alleviate these conditions is lower in the ghetto than elsewhere in the city.

The existence of the ghetto has also resulted in de facto segregation in three schools which have over 80% Black enrollments.

This ghetto has been created by discrimination and poverty. Since 90% of all low income housing in Lansing is located in the ghetto, and since there is a strong relationship between race and poverty, the access of Lansing's Black and Mexican-Americans to housing outside the ghetto is extremely limited. As a result, most of the southern area of Lansing, the location of the proposed Jolly-Cedar project, is almost exclusively white.

Public and private actions have greatly aggravated the shortage of housing available to these low income groups.

---

1. The footnotes to these facts are taken from those studies underlying the facts, and are included to provide a better understanding of their meaning.

2. The statistics which follow are taken in large part from defendants' own studies and submitted requests for funds to federal agencies. See especially plaintiffs' exhibits 4, 5, 6 and 7.

Substantial displacement of low income persons from their homes has occurred due to interstate highways being routed primarily through Black and Mexican-American neighborhoods. Additional displacement is being caused by expansion of the State of Michigan administrative office complex. Industrial expansion has also displaced many members of the groups represented by the plaintiffs.

Although less than 15% of Lansing's population is Black and Mexican-American, it represents over 50% of the persons displaced. The City of Lansing has extensively used zoning variances and building permits to allow this displacement.

In response to these problems, the City of Lansing has begun working with the Department of Housing and Urban Development (HUD) in building housing for these displaced minority groups. As a result of the City's showing of a substantial need for low rent housing, HUD issued a program reservation to Lansing for 1,000 units, a statement of determination by HUD to finance the construction of these housing units. This commitment remains in effect.[3]

Working through the Lansing Housing Commission, the City of Lansing and HUD selected Jolly-Cedar, a twenty-acre parcel located in a white neighborhood in the southern portion of the City, as one of the sites. A major factor in site selection was compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Regulations of HUD pursuant to Title VI, particularly 24 C.F.R. § 1.4(b) and § 205.1(g) of the HUD Low Rent Housing Manual (Exhibit 1), which require that sites be selected outside areas of racial concentration. There were also other reasons for selection of Jolly-Cedar: children of Black and Mexican-American

families would be able to attend predominantly white schools; the site would provide easy access to employment opportunities, transportation, shopping and health facilities; and most future development would occur in this part of the city.

The site was inspected and approved by the Michigan Civil Rights Commission and by the United States Department of Housing and Urban Development.

It was decided to develop the site through the turnkey program of HUD, which enables faster and less expensive development of new low rent housing by more fully utilizing the resources of private industry. The site was zoned for single family residences, which require lot areas of not less than 5,000 square feet per family. It was necessary to change the zoning to community unit plan in order to allow multiple family units.

After extensive investigation, a public hearing, and study by the Planning Board of the City of Lansing, both the Planning Board and the City Council decided that the property adjacent to the proposed development would not be adversely affected, that the proposed development would have a minimal effect on abutting properties, and that the plan would be consistent with the intent and purpose of public health, safety, morals, and general welfare. For these reasons, the necessary zoning change was approved by the City Council.

We find that these hearings were conducted according to due process and that the conclusions reached therein were supported by substantial facts and are therefore adopted by this court.

Numerous other zoning variances have been granted pursuant to the same

3. A letter from Robert C. Weaver, Secretary of HUD, to Michael Davidson, attorney for Plaintiffs, dated May 24, 1968, states: "Our Chicago Regional Office reports that they have assigned a high priority for development of the various low-

rent programs in Lansing for which reservations have been issued. At the present time, no action is being contemplated to cancel or otherwise alter the program reservation for this project."

community unit plan under which Mr. Schaffer, the private developer in this case, applied. None of these community plans has been subject to referendum. They have, however, with few exceptions, been plans which have provided for people of middle and upper incomes who are able to rent at prices beyond the means of the residents of Lansing's ghetto.

Following the zoning change, a referendum petition was presented to the City Clerk in June of 1967, by an organization known as the Committee for Individual Homes, calling for the repeal of the ordinance enacting the zoning change. The Ingham County Circuit Court and the Michigan Court of Appeals ordered Lansing to conduct the referendum, but considered no issues of federal constitutional or statutory law. It is this referendum and these issues which are now before the court.

In addition to the stipulated facts, testimony at the hearing has persuaded the court to make the following additional findings of fact.

The proposed Jolly-Cedar site is the only new site mentioned which conforms to the requirements of both HUD and the City of Lansing. Consistent with the apparent trend, the Jolly-Cedar site is located in the second ward of the City, the only ward which does not at the present time have facilities for low income housing.

The City has suggested eleven alternative sites should this referendum be allowed and succeed. Of those eleven sites, only four are in the second ward, which is the location consistent with the City's policy mentioned above. Of those four, only one is of comparable size. That alternative, however, is partially wooded, has extreme topography requiring extensive grading, is designated park or recreation in the City's master planning, and would also require a zoning change to allow the building of low income housing. Of the alternative sites in other wards, the only proposed site of comparable size is now occupied by a National Guard Armory, and would also require a zoning change.[4]

These facts indicate, first, that the Jolly-Cedar site is by far the best alternative, and, second, that the use of any other comparable site would require a substantial delay. And even after that delay, should this court allow a referendum to be held on this matter, a referendum might also be held on any other proposed site. In this way all possible sites could be eliminated, leaving the displaced Black and Mexican minority groups with nowhere to go.

The testimony of sociologists and educational psychologists indicates that the persistent pattern of discrimination used against Black and Mexican-Americans results in poor quality education, has a detrimental impact on self-confidence, and is likely to decrease motivation and increase crime.[5]

Many badges of slavery have been carried over into modern society: the existence of the ghetto, destruction of family patterns, and a feeling of inferiority are prime examples. The experience of the disadvantaged minority groups in Lansing's ghetto has been consistent with these general conclusions concerning discrimination throughout the nation.[6]

4. These facts are derived from an analysis of plaintiffs' Exhibits 21A–21G.

5. All the experts who testified agreed to this fact and supplemented it. The sources of their testimony provide further detail and enlighten the uninformed as to conditions in the ghetto and the effects thereof. See The Negro American (T. Parsons and K. Clark, eds., 1966), especially Drake, The Social and Economic Status of the Negro in the United States; T. Pettigrew, A Profile of the Negro American (1964), especially Chapter 1; Racial and Ethnic Relations (B. Segal, ed., 1966), especially Simmons, The Mutual Images and Expectations of Anglo-Americans and Mexican-Americans.

6. Lansing's applications for federal housing monies (Plaintiffs' Exhibit H–7) have emphasized that Lansing's problems are similar to those described in

Zoning ordinances have long been used to contain particular racial groups inside the ghetto.[7] This has been true in school zoning as well as property zoning.[8] Improvement in national housing patterns is also inhibited by old zoning requirements which are often used as tools to resist change.[9]

It is critically important to classify these zoning practices for what they are: sophisticated means of invidious racial discrimination; invidious because racial discrimination is difficult to prove in this otherwise acceptable means of city planning.[10]

the Report of the National Advisory Commission on Civil Disorders, March 1, 1968 (U.S. Gov't. Printing Office ed.) (hereinafter called Kerner Report). See also the transcript of the hearing for preliminary injunction (hereinafter called Preliminary Transcript), page 124.

7. Testimony of Dr. Norman Goldner, sociologist specializing in race relations, Preliminary Transcript, at page 192. See also the materials on which Dr. Goldner's testimony was based in part: G. Myrdal, An American Dilemma (1944), at pages 600, 601, and 617; J. Vander Zanden, American Minority Relations (2d ed.1963) at page 216. The use of this sophisticated discriminatory device has also been prominent in the Lansing area, as the testimony of Raymond Guernsey, Planner for the City of Lansing, indicates at Preliminary Transcript, 142–143:

"Q. Well, what you are saying is that these people are locked into the City of Lansing. Right?
"A. Yes.
"Q. Black persons, Mexican Americans, they can't go outside of Lansing right now, can they?
"A. I believe they'd have difficulty obtaining housing outside the City of Lansing. For example, the City of Lansing had an area which it annexed by resolution to a golf course. It was not contiguous, coterminous, with city boundaries. We were discussing the possibility of a housing project on that site. It was in a different school district, in a different residential area, not part of our corporate seat so far as the grouping around it, but it was annexed to the city in just the area of the golf course, and it was near what we call our corporate limits. The people in the area around it attacked the City on a legal action basis some ten years later, saying it was not properly part of the corporate City of Lansing. We were not successful in court, and they had the area withdrawn from the

corporate limits of the City of Lansing and subjected it to their own zoning and code controls.
"Q. So what you got is zoning also acting as a factor in locking in these groups into the inner city of the City of Lansing?
"A. The entire system, sophisticated system of government is involved here, yes. The Model Cities application attempted to attack this." (Emphasis supplied.)

8. Testimony of Professors James B. McKee and Robert L. Green.

9. Ibid.

10. Charles Abrams in a paper entitled The Housing Problem and the Negro printed in The Negro American, supra, note (5), at page 516 traces the history of this invidious use of zoning:

"As opposition crystallized, racial zoning became the main device to keep the Negro in his place and, when the courts struck it down as unconstitutional, the restrictive covenant was thereafter written into deeds in the effort to maintain white supremacy in neighborhoods. About 80 per cent of the vacant land in Los Angeles was at one time covered by such covenants. When the courts held racial covenants unenforceable, subtler devices were ushered in, including overrigid zoning ordinances sternly enforced against Negroes but relaxed for whites. Condemnation for incinerator dumps or other public works is another current device, while building inspectors and other petty officials are always on hand to harass the Negro who ventures where he is not wanted. When, for example, a private builder announced he would sell a few of his houses to Negroes in Deerfield, Illinois, his site was promptly condemned for a park. When the Ford Motor Company moved its plant from Richmond, California, to Milpitas, and when the union tried to build houses for its Negro workers, the area was promptly rezoned for industrial use. Thereafter came a sudden strengthening of building regula-

The Black community in Lansing perceives a vote on this referendum to be a vote on whether Black Americans have equal rights as citizens—rights which are not subject to diminution by the state or by individual citizens.[11]

The court further finds as a matter of fact that the motivation behind circulation of the referendum petitions and the attempts to hold the referendum for denying the zoning variance is in major part based on economic and racial discrimination in housing. This finding is grounded in part upon the uncontroverted testimony of the Planner for the City of Lansing at the hearing on the preliminary injunction, July 10 through July 12, 1968:

"Q. * * * [I]t was your opinion that the purpose for this referendum for defeating this Community Unit Plan project was because these people did not want low-income families in their neighborhoods, many of whom would be black, isn't that correct?

"A. My personal opinion is that answer is quite accurate." (Preliminary Transcript, at 239–40.)

This opinion of the City Planner was not based on speculation, but on his attendance at "all the public hearings on the subject proposal * * *." Preliminary transcript at 157.

That the referendum was in large part racially motivated is corroborated by the testimony of Dr. Goldner, who stated that in his opinion in a case such as this, the motivation of the middle class whites would be to exclude "black and poor people" from the neighborhood.[12]

This finding of fact is also based upon the knowledge that similar zoning variances have often been used in Lansing to allow the construction of community unit housing for middle and upper income groups, with NO opposition from the public.[13]

One final point should be disposed of in this regard. It was suggested in arguments (although no evidence was introduced to substantiate the point) that the objection to the housing was not racial, but related to density of population. The facts introduced simply do not permit the court to reach that conclusion.

In the first place, the one-family zoning which the referendum circulators favor limits density to 5,000 square feet per family,[14] or 8.7 families per acre. Yet the density of the Jolly-Cedar project is stipulated to be only 8.05 families per acre[15]—less than the maximum density allowed under the present zoning.

Furthermore, City Planner Raymond Guernsey rebutted any claim that density was the primary motivating factor behind this referendum:

"Q. And this is the only one [multiple unit project] which has ever been subject to a referendum or vote. This is a stipulated fact. Is that your understanding as well?

"A. Since I have been with the City, it is the first I have knowledge of.

"Q. As City Planner for the City of Lansing and a member of the Board or employee of the Board, is that right, which approved this particular Community Unit Plan, can you describe any reason for this unique phenomena?

"A. Having attended all the public hearings on the subject proposal, I would gather the residents in the area surrounding this particular project were opposed to

tions, followed by a hike of sewer connection costs to a ransom figure."

11. Testimony of Professor Robert L. Green.

12. Preliminary Transcript, 186–188, 199.

13. Stipulation of Facts, No. 22.

14. Section 36–44(5), Code of the City of Lansing (1966).

15. Stipulation of Facts, No. 20.

those of low income being moved into the area.

"Q. Many of whom * * * were very likely to be black people—right?

"A. Yes, we would assume that portion of the population would be Negro." Preliminary Transcript 156–7.

Thus, almost all of the evidence before the court supports the same conclusion: this referendum is in substantial part racially motivated.

The City of Lansing by its participation in and conduct of a referendum with this motivation, and with the aforementioned connotation in the mind of the public, would be a full partner in this private discrimination.

The Black members of the Lansing ghetto are not the only victims of racial discrimination. At present, because of the economic, social and cultural disadvantages of Mexican-Americans in the Lansing area, as well as their darker complexion, they *also* are the victims of racial discrimination within the meaning of the thirteenth amendment.[16]

## LEGAL ISSUES

The parties would agree and we may assume that the citizens of Lansing have the requisite power to zone, whether it be through ordinance of the City Council or through referendum. The question before the court is whether the exercise of that power in this particular case deprives the plaintiffs of rights secured by the United States Constitution and the federal statutes enacted thereunder. If it does, the referendum may not be held, for it would be in violation of the supremacy clause of the United States Constitution, article VI, clause 2.

There appear to be two theories under which the plaintiffs may prevail in this case. The first is that the Jolly-Cedar project is a duly approved and funded federal housing project authorized by Acts of Congress enacted pursuant to constitutional provisions. According to this theory the action by the City of Lansing threatens the accomplishment of this project, thus depriving plaintiffs, who are potential applicants for residence in the Jolly-Cedar development, of rights and benefits conferred on them by an act of Congress implementing the thirteenth and fourteenth amendments.

The second theory is that the action of the residents who initiated the referendary petitions was motivated by racial prejudice. The City in putting the referendum on the ballot, would thereby be involved in private discrimination in violation of the thirteenth amendment and the equal protection clause of the fourteenth amendment of the United States Constitution; section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1982; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Supreme Court doctrine set forth in Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). Acceptance of either theory would require a decision in favor of plaintiffs.

We first consider the supremacy clause theory. There is little doubt that the Jolly-Cedar development is in large measure a product of the federal housing program. While development under the turnkey program is not directly controlled by the federal government, that program is a significant part of the congressional attempt to provide adequate housing for disadvantaged persons, many of whom are members of minority groups. One of the main reasons behind the selection of the Jolly Cedar site was the federal policy to encourage the development of low rent housing outside areas of racial concentration.

The Kerner Commission Report recommended that the major thrust in low

16. Testimony of Professors James B. McKee and Robert L. Green. See also Mydral, supra, note (8), at 53.

cost housing should be made in non-ghetto areas:

"Enactment of a national fair housing law will eliminate the most obvious barrier limiting the areas in which nonwhites live, but it will not deal with an equally impenetrable barrier, the unavailability of low and moderate income housing in nonghetto areas.

"To date, housing programs serving low-income groups have been concentrated in the ghettos. Nonghetto areas, particularly suburbs, have for the most part have [sic] steadfastly opposed low-income, rent supplement, or below-market interest rate housing, and have successfully restricted use of these programs outside the ghetto.

"We believe that federally aided low- and moderate-income housing programs must be reoriented so that the major thrust is in nonghetto areas. Public housing programs should emphasize scattered site construction, rent supplements should, wherever possible, be used in nonghetto areas, and an intensive effort should be made to recruit below-market interest rate sponsors willing to build outside the ghettos.

"The reorientation of these programs is particularly critical in light of our recommendation that 6 million low and middle-income housing units be made available over the next 5 years. If the effort is not to be counterproductive, its main thrust must be in nonghetto areas, particularly those outside the central city."[17]

Paragraph 4g of the Department of Housing and Urban Development's Low-Rent Housing Manual, Section 205.1, states:

"* * * The aim of a Local Authority in carrying out its responsibility for site selection should be to select from among sites which are acceptable under the other criteria of this Section those which will afford the greatest opportunity for inclusion of eligible applicants of all groups regardless of race, color, creed, or national origin, thereby affording members of minority groups an opportunity to locate outside of areas of concentration of their own minority group. Any proposal to locate housing only in areas of racial concentration will be *prima facie* unacceptable and will be returned to the Local Authority for further consideration."

It is obvious that the proposed referendum in this case, if passed, would seriously impede this federal policy.

The reasoning behind the above policy is similar to that used by Congress in enacting the Civil Rights Act of 1866, including 42 U.S.C. § 1982; the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq. (July 1968 Supp.) The policy behind these statutes, simply stated, is to erase the effects of racial discrimination from society.

The thirteenth amendment not only abolished slavery, it also gave Congress the authority to adopt legislation which would terminate the vestiges of slavery which so tenaciously cling to the body and horrendously permeate the soul of our society.

This idea was first, and perhaps most eloquently enunciated by Mr. Justice Harlan dissenting in the Civil Rights Cases, 109 U.S. 3, 35, 3 S.Ct. 18, 39, 27 L.Ed. 835:

"That there are burdens and disabilities which constitute badges of slavery and servitude, and that the power to enforce by appropriate legislation the thirteenth amendment may be exerted by legislation of a direct and primary character, for the eradication, not simply of the institution, but of its badges and incidents, are propositions which ought to be deemed indisputable. They lie at the

---

17. Kerner Report 263. The City of Lansing emphasized the findings of the Kerner Report in its application for federal housing funds. Preliminary Transcript at 124.

foundation of the Civil Rights Act of 1866."

Harlan's dissenting position became the majority view in Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). The Supreme Court there held that the thirteenth amendment gave Congress the power to enact the Civil Rights Act of 1866 and that Section 1 of that Act, currently 42 U.S.C. § 1982, bars all racial discrimination in the sale or rental of property, real or personal. Justice Potter Stewart, speaking for the Supreme Court in the Jones case, decided in June of 1968, said:

> " 'By its own unaided force and effect,' the Thirteenth Amendment 'abolished slavery, and established universal freedom.' Civil Rights Cases, 109 U.S. 3, 20, 3 S.Ct. 18, 28 [27 L. Ed. 835]. Whether or not the Amendment *itself* did any more than that— a question not involved in this case— it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more. For that clause clothed 'Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery* in the United States.' Ibid. (Emphasis added.)" 392 U.S. at 439, 88 S.Ct. at 2203.

One of the badges of slavery that surely remains and must be eradicated is the crowding of minority groups into the ghettos of our cities In the Jones case, supra, Justice Stewart further said:

> "Just as the Black Codes, enacted after the Civil War * * * were substitutes for the slave system, so the exclusion of Negroes from white communities became a substitute for the Black Codes. And when racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery." 392 U.S. 441, 88 S.Ct. 2204.

The present case arises as a result of a congressional attempt to erase that remnant of slavery.

■ Article VI, clause 2, of the United States Constitution provides that the Constitution and all laws enacted pursuant thereto shall be the supreme law of the land. An action approved by the entire electorate of the State of Michigan could not serve to nullify rights created by or arising out of the United States Constitution. There is little doubt that the action by the City of Lansing in this case of conducting this racial referendum would deprive plaintiffs of fundamental constitutionally secured rights and would serve only those forces of discrimination which seek to frustrate the aforementioned constitutionally declared policy. Because of the supremacy clause of the Constitution, that action is impermissible.

Defendants claim, however, that because the federal government, in administering the turnkey program, recognizes the necessity of working within the zoning regulations of local communities, the power of the City of Lansing to zone has not been abrogated. We do not disagree with this argument, for it is obvious that although the federal government has the power to disregard local zoning laws, the requirement for good federal-community relations and proper administration of local programs requires due regard for long range plans and related development by the municipal government.

However, more is involved here than the mere power to zone. Up to this point in time the federal government and the private developer have proceeded with due regard for local zoning and development plans. The City Council granted a zoning change for the Jolly-Cedar site only after a full hearing by the Planning Board and an appropriate recommendation from the Board to the Council.

We may assume that the project as proposed is compatible with, and even in furtherance of, long range plans of the City of Lansing. We find that the federal government has fully complied

with its self-imposed obligation to work within the framework of local plans. However, the proposed referendum at this point unduly impedes implementation of federal policy under the supremacy clause and must be enjoined.

If referenda of this type were consistently permitted, it would be possible for racially motivated people to totally prevent implementation of the congressional policy of building low cost housing outside the ghettos of our cities in order to ease racial tension and secure a better life for many of our citizens. Such a potentiality to frustrate the federal constitutional and statutory policy cannot be tolerated.

Plaintiffs' second theory is that the conducting of this referendum makes the City of Lansing a partner in discrimination in violation of the Constitution.

█ It should first be emphasized that the overwhelming weight of the evidence has caused this court to find that racial discrimination was a primary motivation behind this referendum.

In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830, the Supreme Court held that the adoption of an anti-open housing provision in the California State Constitution by an initiatory referendum was an action of discrimination in violation of the equal protection clause of the fourteenth amendment. The Court affirmed the California Supreme Court in holding that the California constitutional provision (Section 26), " * * * was legislative action 'which authorized private discrimination' and made the State 'at least a partner in the instant act of discrimination * * *.' " 387 U.S. at 375, 87 S.Ct. at 1631, 18 L.Ed.2d at 835. The court then said at 387 U.S. 378, 87 S.Ct. 1632, 18 L.Ed.2d 836:

"This Court has never attempted the 'impossible task' of formulating an infallible test for determining whether the State 'in any of its manifestations' has become significantly involved in private discriminations. 'Only by sifting facts and weighing circumstances' on a case-by-case basis can a 'nonobvious involvement of the State in private conduct be attributed its true significance.' Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860 [6 L.Ed. 2d 45].

In his concurring opinion in the Reitman case, Mr. Justice Douglas saw the problem as being "in the realm of zoning, similar to the one we had in Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161." The Court there held that restrictive covenants were invalid as an attempt to privately zone against Black people. Where, as in this case, the zoning is motivated by the same factors of racial prejudice, but is carried out under the auspices of the state, the action must be even that much more invalid. In Reitman, Justice Douglas said:

"Zoning is a state and municipal function. See Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 389 et seq., 47 S.Ct. 114, 71 L.Ed. 303, 311, 54 A.L.R. 1016; Berman v. Parker, 348 U.S. 26, 34–35, 75 S.Ct. 98, 99 L.Ed. 27, 38, 39. When the State leaves that function to private agencies or institutions which are licensees and which practice racial discrimination and zone our cities into white and black belts or white and black ghettos, it suffers a governmental function to be performed under private auspices in a way the State itself may not act." 387 U.S. at 384, 87 S.Ct. at 1635.

It would stretch credulity to conclude that the referendum here is not motivated by racial factors. In Otey v. Common Council, 281 F.Supp. 264 (E.D. Wis.1968), the district court was faced with the task of determining whether a proposed resolution before the Milwaukee Common Council, to the effect that that body should not enact any ordinance restricting the right of owners to sell or lease private realty, violated the fourteenth amendment. The court

considered evidence of racial discrimination and found that:

"The record, including not only the testimony of witnesses but also evidence of the housing patterns existing in the City, reveals that economics is not a determining factor when Negroes attempt to relocate their homes. Race is a factor of almost transcendent significance and Negro home buyers or lessees wishing to leave the inner city are faced with barriers of discrimination which few have been able to overcome. When housing outside the inner city is sought, attributes otherwise crucial in choosing buyers and tenants, such as ability to pay, educational background, demeanor, reliability and stability, are not even investigated by sellers and landlords after the color of the applicant is discovered. Although other excuses may be and are given, it is clear that racial discrimination on the part of sellers and landlords or those whose opinions influence their actions is responsible for the Negroes' inability, except in rare instances, to leave the inner city." 281 F.Supp. at 270.

The same finding applies to the case at bar, and was supported by substantial first-hand as well as expert testimony.

As in Reitman, the Otey court found that adoption of the resolution would be a public act in support of private discrimination, and hence violative of the equal protection clause of the fourteenth amendment.

■ Taking the test set forth in the Reitman case, supra, this court with knowledge of the facts and circumstances in this case, and of the practical potential impact of the referendum, which calls for a vote on the constitutional rights of plaintiffs to protection from discrimination in securing private housing, and its familiarity with the manner in which the referendum would operate to harm them, holds that the referendum would involve the state in private racial discrimination to an unconstitutional degree.

Since the decision in Reitman, similar cases have been decided by other lower federal courts. The most relevant cases are Spaulding v. Blair, 4th Cir., Oct. 29, 1968, 403 F.2d 862; Holmes v. Leadbetter, E.D.Mich., Aug. 16, 1968, 294 F. Supp. 991; Otey v. Common Council, supra.

In all three of these cases, the proposed referendum dealt with open housing. In Otey and Holmes, the federal district courts held that the conducting of such a referendum would be unconstitutional. In Spaulding, the Fourth Circuit held that a referendum on open housing was merely a neutral act, since it would not create a state constitutional right to discriminate.

The case at bar is distinguishable from Spaulding. First, this case deals with federal involvement and thus the supremacy clause becomes a consideration not raised in any of the other cases. Second, no finding of racial motivation or discriminatory effect was made in Spaulding.[18] In this case, both the racial motivation and discriminatory effect have been specifically found to be established facts.

These are not distinctions without a difference, for they illustrate the two basic and independent points on which this decision stands: federal pre-emption and municipal furtherance of discrimination.

■ This court does not hold that the plaintiffs in this case, and others similarly situated, have a constitutional right to low cost housing. All that we decide is that when the federal government exercises its constitutional authority to provide for the welfare of its citizens and erase the vestiges of slavery that remain in this society, the object of that governmental action may not be deprived of its intended benefits by means of discriminatory tactics on the local level.

18. This factor also distinguishes Spaulding from Otey and Holmes.

■ Although federal civil rights statutes are couched in declaratory terms and provide no explicit method of enforcement, federal courts are not powerless to act. In such a case, the district court is encouraged by the Supreme Court to fashion an effective, equitable remedy equal to the needs of the case. The circumstances of this case, as in Otey and Holmes, indicate the need for the issuance of a permanent injunction.

There is no doubt that plaintiffs will suffer irreparable harm if a permanent injunction is not issued. The effect of any further delay is perhaps best stated by the defendant City of Lansing in its answer to the previous petition for mandamus before the State Circuit Court in Ingham County:

> "A crisis situation in housing for low income families exists in the City of Lansing. This is so widely known throughout the community as to be a proper subject for judicial notice, shown by the exhibits attached to the Motion for Intervention.
>
> \* \* \* \* \* \*
>
> "In order to help meet this critical need for housing for persons of low income in the City of Lansing, the City has established and is diligently pursuing a program of public housing for low income families. \* \* \*
>
> *"Because of said need for low income housing, any and every delay in the development and completion of the above-described housing project will cause needless suffering and want in the City of Lansing among persons of low income and will substantially contribute to those conditions which breed and encourage hatred, civil disobedience and public violence in the city."* (Emphasis supplied.) Preliminary Transcript, 26–28, quoting p. 5, § XII of the City of Lansing's answer to the Ingham County action.

It has been established that the mere holding of the referendum would serve to deepen the mistrust and increase the violence between the races.

It is imperative to relieve the human suffering and deprivation which will remain and increase as long as plaintiffs and others similarly situated remain living in substandard housing. Each day that the children of plaintiffs remain under these stifling conditions lessens their chances of eventually leading healthy and productive lives.

■ For all of the above reasons, it is hereby ordered that the injunction prayed for in plaintiffs' complaint be and hereby is granted.