Augustine L. RANJEL, Asencion de Leon, Jr., Virginia Arriaga Williams, Macedonia Ayala, Betty Basey, Ira Q. Miller, Antonio M. Lira, Geraldine Hicks and Ruby Mack, Plaintiffs-Appellees,

v.

CITY OF LANSING, Gerald W. Graves, Mayor, and Theo Fulton, Clerk, City of Lansing, Defendants-Appellants.

No. 19333.

United States Court of Appeals
Sixth Circuit.

Oct. 28, 1969.

Thomas C. Mayer, Detroit, Mich., for appellants; Oskar M. Hornbach, City Atty., Lansing, Mich., Norman C. Farhat, Special Asst. City Atty., Farhat, Burns & Luoma, Lansing, Mich., on brief; Mayer & Mayer, Detroit, Mich., of counsel.

Michael Davidson, New York City, for appellees; Jack Greenberg, New York City, Paul Rosen, William Goodman, Detroit, Mich., on brief.

Jerold. Lax, Avern Cohn, Detroit, Mich., on brief as amicus curiae of the American Jewish Committee.

Robert R. Soltis, Cleveland, Ohio, on brief as amicus curiae for the American Independent Party of Ohio.

Frank J. Kelley, Atty. Gen., William F. Bledsoe, Asst. Atty. Gen., Detroit, Mich., on brief as amicus curiae for Michigan Civil Rights Commission.

Before WEICK and PECK, Circuit Judges, and MACHROWICZ, District Judge [*].

PER CURIAM.

The suit was brought in the District Court by poor black and Mexican-Americans to enjoin a referendum on a "spot" zoning ordinance enacted by the Council of the City of Lansing, which ordinance rezoned a twenty-acre site at Jolly and Cedar Streets in a white neighborhood in said City, from a zoning classification of "A" One Family Residential district to a community unit plan which would consist of one hundred low rent townhouse units and a low rent five-story apartment building containing one hundred fifty units for the elderly.

The rezoning had been applied for by a private developer who had been selected by the Lansing Housing Commission to build the units with funds supplied by the United States Department of Housing and Urban Development (HUD). The rezoning ordinance was not of general application. It provided only a "spot" zoning variance from the general zoning classification.

The City Council granted the application of the developer and passed the spot zoning ordinance. In the approved plans for the project the density of the housing for low income families was 8.05 families per acre. The housing for the elderly raised density for the development above the average density allowed in single-family districts.

Acting under the Charter of the City of Lansing, an organization known as Committee For Individual Homes circulated a referendum petition on the spot rezoning ordinance. The petition was signed by more than 15% of the electors of the city and was presented to the City Clerk, but he refused to accept it.

A mandamus action was brought against the City Clerk, the City Council and the City of Lansing in the Circuit Court of Ingham County, Michigan, to compel them to process the petition in accordance with the Charter provisions. The Circuit Court, after hearing, issued its writ of mandamus. The case was appealed to the Michigan Court of Appeals which affirmed the decision of the Circuit Court. Parr v. Fulton, 9 Mich. App. 719, 158 N.W.2d 35 (1968).

The City Council then determined to submit the proposal to the electorate and scheduled the election for August 6, 1968.

Upon the filing of the present action in the District Court, the Court granted a preliminary injunction restraining the City from conducting the election, and later made it permanent. Ranjel v. City of Lansing, 293 F.Supp. 301 (D.C.W.D. Mich.1969). The defendants appealed to this Court. We reverse.

A goodly portion of the opinion of the District Court was devoted to a vivid portrayal of the tragic conditions affecting the poor black and Mexican-Americans living in the slum areas in Lansing, and the need to alleviate these conditions by moving them out of the slums to more desirable neighborhoods. These conditions, however, concerning the plight of the poor, were not peculiar to Lansing nor indeed to the United States, but have existed for centuries in many places throughout the world.

It would seem to us that there should be a better way to achieve this worthy goal without enjoining an election and thereby depriving the citizens of a community of their right of suffrage.

The District Judge based his decision on two grounds, (1) the Supremacy Clause of the Constitution, and (2) his finding that the motivation behind the circulation of the referendum petition was in part racial and that the rights of the plaintiffs under the Thirteenth and Fourteenth Amendments were thereby violated.

### The Supremacy Clause

▮ The Supremacy Clause of the Constitution is applicable only when a

[*] Honorable Thaddeus M. Machrowicz, Judge of United States District Court for the Eastern District of Michigan, sitting by designation.

state law conflicts with a valid federal law, and in such event the latter controls. Free v. Bland, 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962).

The District Court relied on Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. and Regulations of HUD pursuant thereto, particularly 24 C.F.R. §§ 1.4(b) and 205.1(g) of HUD's Low Rent Housing Manual, as requiring "that sites be selected outside areas of racial concentration." We find no such provision in Title VI of the Civil Rights Act of 1964. § 2000d–1 of the Act does enable Federal Departments extending federal financial assistance to issue rules, regulations or orders of general applicability, which shall not become effective unless and until approved by the President.

Likewise, 24 C.F.R. § 1.4(b) contains no provision relative to selection of sites outside of areas of racial concentration. The only place where such provision appears is in paragraph 4(g) of HUD's Low Rent Housing Manual, Sec. 205.1.

Appellant did stipulate that HUD's Low Rent Housing Manual was a regulation, but later found that was incorrect. It did not feel bound by that stipulation since it involved a mistake of law. The manual is not contained in the Federal Regulations, nor was it shown that it had presidential approval.

While HUD's manual contains guidelines concerning the conditions under which housing projects may obtain federal financing, in our judgment the manual does not rise to the dignity of federal law; but even if it did, the Charter of the City of Lansing providing for initiative and referendum does not conflict with it. As we will show below, the referendum was not discriminatory but was founded on neutral principles.

The District Court also relied on the Kerner Commission Report, but obviously such report is not a federal regulation. Thus the provisions of Lansing's Charter conflict with no federal law.

## Racial Motivation

It must have been a "shock" to the City for plaintiffs to claim, and for the District Court to hold, "that the conducting of this referendum makes the City of Lansing a partner in discrimination in violation of the Constitution," (293 F.Supp. at 311 (1969)) for it was the City that established the Housing Commission; that originated the project and applied to HUD for the financing of it; that enacted the ordinance providing for the variance in the zoning; that approved the plans and specifications of the developer; that refused to accept the referendum petition; that resisted the mandamus action in the Circuit Court; that appealed the adverse decision of the Circuit Court to the Michigan Court of Appeals; that co-operated in every respect with the housing project until the mandamus decision became final, when the City had no choice but to place the issue on the ballot as ordered by the Court or take the consequences of being held in contempt.

The only purpose in naming the City as a partner was to establish state action inasmuch as private acts of discrimination are not unconstitutional.

In holding that the referendum was motivated by racial factors, the District Court necessarily had to reach that conclusion by searching the minds of 15% of the electorate who signed the referendum petition, and the remaining 85% who were enjoined from voting, none of whom were called as witnesses to testify in the case. The Committee For Individual Homes which circulated the petition was not made a party to the action in the District Court.

The Court relied upon opinion evidence to support its findings as to discrimination. City Planner Guernsey, who attended a public meeting, testified that residents in the area were opposed to low income people being moved there, many of whom were black. He did not indicate that the opposition was on racial grounds. He testified that there was op-

position to overloading the schools in the district, and to the change of zoning from "A" one-family, to the higher density and multiple family housing.

People also stated that they had purchased their homes when the area was zoned for single family residences and did not think it was proper to change it. Guernsey also testified that shortly prior to the present project the residents in the area objected to the rezoning of land located 1000 to 1500 feet to the west, from "A" one-family to "D-M" multiple family, which was a private development not involving low income housing. The Planning Board sustained the objections; City Council concurred, and the property was not rezoned.

The District Court also relied on testimony of Dr. Goldner, not a resident of Lansing, who undertook to give his opinion that the motivation of the middle class whites would be to exclude black and poor people from the neighborhood. Although he had no experience in Lansing, Dr. Goldner testified:

"Unless the people of Lansing that we are considering are much different than other people that have been studied rather extensively, I would say that their motivation is to keep out black and poor people."

On cross-examination, however, he limited his previous answer:

"Q Now, you did state, however, that the motivation of the people of the City of Lansing was to keep out black and poor people.

"A No, sir. I said that, as I recall my own remarks, I said that I was not commenting upon the intent but upon the effect of their actions."

In our judgment, this type of opinion evidence does not support the findings of discrimination made by the District Court. But if the electors had a legal right to a referendum, their motive in exercising that right would be immaterial.

City Planner Guernsey further testified that without changing the zoning ordinance, low income housing can be built in an "A" one-family residential district. This would permit construction of the one hundred houses for the poor black and Mexican-Americans, but not the five-story low rent apartment for the elderly. Thus the existing zoning does not discriminate against poor blacks, Mexican-Americans, or any others who are free to move into the area in low-cost homes.

We have no way of knowing whether the Lansing voters would have repealed the zoning variance if they had not been enjoined by the District Court from voting on the resolution. But even had they repealed the variance, this would not violate the Fourteenth Amendment. In Hunter v. Erickson, 393 U.S. 385 at 390, 89 S.Ct. 557 at 560, 21 L.Ed.2d 616 (1969), Mr. Justice White, who wrote the opinion for the Court, stated in footnote 5:

"Thus we do not hold that mere repeal of an existing ordinance violates the Fourteenth Amendment."

Justice Harlan pointed out in an opinion concurred in by Justice Stewart, that referendum may not be attacked on Equal Protection grounds since it is founded on neutral principles. In view of this, the finding that the City of Lansing in complying with a mandamus order was a partner in the discrimination, is clearly erroneous.

■ Initiative and referendum is an important part of the state's legislative process. Being founded on neutral principles, it should be exempt from Federal Court constraints. Spaulding v. Blair, 403 F.2d 862 (4th Cir. 1968).

Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), relied on by the District Court, is inapposite. In that case an effort had been made by

a mandamus action to keep the proposal to amend California's Constitution off the ballot, but the Supreme Court of California ruled it would be more appropriate to pass upon the legal questions after the election rather "than to interfere with the power of the people to propose laws and amendments to the Constitution and to adopt or reject the same at the polls." Mulkey v. Reitman, 64 Cal.2d 529, 535, 50 Cal.Rptr. 881, 885, 413 P.2d 825, 829 (1966). The California Supreme Court considered the proposal after election and held that it did more than merely repeal existing law but authorized discrimination in the housing market and was unconstitutional. The Supreme Court of the United States affirmed.

Reliance on Otey v. Common Council of City of Milwaukee, 281 F.Supp. 264 (D.C.E.D.Wis.1968) is misplaced. In that case the District Court did indeed enjoin an election on an initiative proposal which prohibited the City Council of Milwaukee from enacting any ordinance restricting the right of owners of real estate to sell, lease or rent property. The Court held that the proposal, if passed, would be unconstitutional. Another reason of the Court for enjoining the election was to prevent a threatened riot.

We believe the better practice was that followed by the Supreme Court of California in *Reitman,* which allowed the election to proceed and ruled on the validity of the measure after its passage.

■ Nor do we think that citizens should be deprived of their right of suffrage merely because a riot was threatened. It would be more appropriate to enjoin unlawful acts of rioters than to deprive the electorate of their right of franchise. In the present case no riot was even threatened.

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.